Filed 9/17/20  P. v. Rios CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E070375 |
| v. | (Super.Ct.No. RIF1502065) |
| JUAN JOSE RIOS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.

Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief

Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Michael P.

Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Juan Jose Rios of three counts of aggravated sexual assault (rape) of a child (Pen. Code, § 261, subd. (a)(2))[1] and two counts of oral copulation of a child (§ 269, subd. (a)(4)). Rios was sentenced to five consecutive sentences of 15 years to life for a total sentence of 75 years to life.

On appeal, Rios contends that (1) the jury should not have been instructed on Rios's consciousness of guilt based on fabricated testimony because it was not conclusively established that any testimony was false or that Rios was involved in any fabrication; (2) the prosecutor committed prejudicial misconduct during her closing argument by purportedly misstating the law and invoking the prestige of her office; (3) the trial court failed to make the required factual findings to support imposition of mandatory consecutive sentences under section 667.6, subdivision (d) (section 667.6(d)); (4) the evidence was insufficient to support those findings; and (5) the trial court erred by imposing various fines and fees without holding an ability to pay hearing. We conclude that insofar as any of Rios's claims of error have merit, the errors were harmless. We affirm the judgment.

BACKGROUND

A. *Offenses Against Jane Doe 1* (*Rios's Niece*)

Jane Doe 1 was 21 years old when she testified at trial. Rios is her maternal uncle. From 2002 to 2005, Rios lived with her family. He sometimes slept inside the house on a couch and sometimes in a shed in the backyard, which was furnished with a bed. Doe 1's

---

[1]    Unlabeled statutory references are to the Penal Code.

mother testified that Rios lived with her family for approximately one year before his wife, Veronica L., moved in with them.

With respect to Doe 1, the information charged Rios with three counts of rape of a child (§ 261, subd. (a)(2)) and two counts of oral copulation of a child (§ 269, subd. (a)(4)), one count each for separate incidents occurring between April 2003 and April 2005—between Doe 1's seventh and ninth birthdays.

Doe 1 was seven years old when Rios first sexually abused her. Rios called her into the shed to play. Once she was inside, Rios pulled down Doe 1's pants and told her not to say anything and to keep quiet. Rios laid her down on the bed and pulled his pants down too. He inserted his penis into her vagina and continued doing so for approximately 15 minutes. She told Rios to stop, and he responded in an authoritative manner, "'Just be quiet. And nobody will believe you if you say that I'm hurting you.'" She was "really scared." He also told her, "'Nobody is going to pay attention.'" Rios eventually told Doe 1 to go back inside because her grandma might be looking for her. Afterward, Doe 1 was in pain and saw blood on the toilet seat when she used the bathroom. She did not tell anyone what had happened.

Over the next year and one-half to two years, Rios sexually abused Doe 1 approximately once every one or two months. Doe 1 estimated that Rios sexually abused her a total of at least 10 times during that period. She could not recall the details of each incident. She testified that Rios penetrated her with his penis in the shed on "multiple

3

occasions," which she said happened "twice." She also said that "things" happened in the shed "three" times.

After the first incident, Doe 1 felt that she could not say "no" to Rios because of his warning that no one would believe her. She worried that he would tell her mom that she "was the person that wanted this intercourse." She also was afraid of Rios. In addition, her parents had told her "to listen to what the older people say" and to "follow [her] aunt's and uncle's orders and always be respectful to them." If her uncle told her "to go get him water or to get out of the room and go somewhere else," she "would do it."

Doe 1 recalled one other incident that occurred in her mother's restroom. Doe 1 followed Rios into her mother's restroom at his direction. Rios pulled down his pants, sat on the toilet seat with the lid closed, told her to sit on him, which she did, and he inserted his penis into her vagina. She could not recall whether Rios forced her to orally copulate him in the bathroom also, but she did remember telling police that she also orally copulated Rios during this incident. Doe 1 also recounted the details of two incidents in which Rios forced her to orally copulate him—once in the garage and once in the car. When Rios's wife moved in, Rios stopped sexually assaulting Doe 1.

B. *Uncharged Acts Against Jane Doe 2* (*One of Rios's Sisters*)

When Doe 1 was 18 years old, she disclosed what Rios had done to her to Jane Doe 2, one of her maternal aunts and Rios's younger sister by four years. Another relative had prompted Doe 1 to speak with Doe 2 after noticing that Doe 1 acted

4

differently when Rios was around Doe 1. Doe 2 shared that Rios had also sexually abused her when she was growing up. That day, the two women decided to report the abuse to the police because at that point Rios had two children, including a young daughter who was in kindergarten and had suffered from vaginal infections.

At the police station, Doe 1, Doe 2, and Doe 1's mother were initially situated in an interview room and left alone. A pinhole camera in the wall recorded the women, and they were not advised that they were being recorded. Doe 1 and Doe 2 discussed the possible benefits to them of talking to a psychologist. They theorized that Rios had been sexually abused or was mentally ill. In discussing the possibility of having to testify against Rios, Doe 1 said, "I don't even want to cry anymore, I don't want to think about anything. I just have hatred. I would like him to die." Doe 2 said that she felt "revulsion" toward Rios too but that she had been "recovering." She further explained that, "It doesn't go away."

C. *Defense Case*

Rios testified on his own behalf and denied ever touching Doe 1 or Doe 2 in a sexual manner. He claimed to have moved into Doe 1's house with Veronica L., and said that the two did "not separate."

Veronica L. also testified. She lived with Rios at Doe 1's house for approximately 10 months. The two slept in the shed in the backyard. She said that she was with Rios all of the time when he was inside the house and that he would not go inside without her. They would even accompany each other into the restroom every time one of them needed

5

to use it. Doe 1 acted "normal" around Rios and neither avoided him nor appeared afraid of him. Other adult relatives of Rios's, including his mother, observed Doe 1 acting normal around Rios.

D. *Allegations About Doe 1*

Rios's son, John Doe (John), testified. He was attending seventh grade at the time. John said that four years earlier Doe 1 had touched his "front crotch part" on two separate occasions. He did not tell anyone at the time because he was afraid.

The attorney who represented Rios through the preliminary hearing testified as a rebuttal witness. John's allegations were first reported to the attorney by either Rios, Rios's mother, Veronica L., or all three people; they informed the attorney that John alleged that Doe 1 had inappropriately touched him at some point. Neither the attorney nor anyone else reported the allegations to the police at that time. The attorney was concerned that the allegations could be manufactured or false. The family hired a private investigator to interview John with the attorney present approximately two months after the allegations were made. The attorney reported the allegations to the police three to four weeks after the interview because Veronica L. did not feel comfortable going to the police station herself.

After the allegations were reported to law enforcement, a social worker with child protective services conducted a forensic interview of John. A video recording of that interview was played for the jury. When the interviewer initially asked John to describe the incidents of inappropriate touching in detail, John responded, "Sure. Uh, doing it,

6

um, I'll try to do it perfectly." Later in the interview, when John was asked, "what made you finally tell your mom," he responded, "'Cause she says, 'That this could help my, uh, my dad.'" The interviewer later asked him whether what he was saying was true or whether he was "say[ing] it happened 'cause you think it will help your dad in jail." John responded, "I just say 'cause, um, I felt worried and I don't think it's fair that they do this to my dad." When the interviewer returned after a brief break and asked John what he had been thinking about during the break, John said, "I was like and I—I was memorizing."

After Rios was first arrested and incarcerated, Veronica L. would take John to visit with his father in jail approximately once a week or every other week before John made these allegations. John also spoke with Rios on the phone. Rios claimed that he did not speak with John about the allegations. Rios's mother also visited him in jail at least once every month from his arrest in 2015 through her testimony in 2018. Rios explained that when he made telephone calls from jail that a recording would interject a warning that the phone call was being recorded. When someone would visit him in jail, he would communicate with that person over a different type of telephone. There were no warnings that conversations over the telephone with in-person visitors were being recorded.

DISCUSSION

A. *Consciousness of Guilt Instruction—CALCRIM No. 371*

Rios argues that the trial court prejudicially erred by instructing the jury with CALCRIM No. 371, which allowed them to infer consciousness of guilt based on fabrication of evidence.[2]  The People counter that the argument was forfeited by Rios's failure to object below and that the instruction was supported by substantial evidence in any event.  We agree that the instruction was supported by substantial evidence.  We therefore need not address the People's argument about forfeiture.

CALCRIM No. 371, as given to the jury, provides in relevant part:  "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions.  It is up to you to decide the meaning and importance of this evidence.  However, evidence of such conduct cannot prove guilt by itself."  The trial court instructed the jury with CALCRIM No. 371 at the People's

---

[2]    To the extent that Rios also claims that CALCRIM No. 371 violated due process by unconstitutionally lightening the prosecutor's burden of proof, our Supreme Court has already rejected that argument as to CALCRIM No. 371's predecessor instructions. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1226 [concluding CALJIC Nos. 2.06 & 2.52, the predecessors of CALCRIM No. 371, do not impermissibly lighten the prosecutor's burden of proof]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 (*Coffman & Marlow*).)  We are bound by those decisions.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

request, and defense counsel did not object. Rios does not claim that the instruction misstates the law.

Rios contends that direct evidence that John committed perjury and direct evidence that Rios had some "connection" with that testimony was necessary for CALCRIM No. 371 to be given. We do not agree. Direct evidence is not required. (*Coffman & Marlow*, *supra*, 34 Cal.4th at p. 102 [facts giving rise to an inference of consciousness of guilt need not be conclusively established before consciousness of guilt instruction may be given].) Rather, "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*Ibid.*, citing *People v. Hannon* (1977) 19 Cal.3d 588, 597-598 (*Hannon*), overruled on another ground in *People v. Martinez* (2000) 22 Cal.4th 750, 761-762; *People v. Watkins* (2012) 55 Cal.4th 999, 1027-1028.) Put another way, all that is needed is "sufficient evidence to raise an inference that [Rios], and others acting on his behalf and with his authorization, tried to persuade a witness to testify falsely."[3] (*People v. Alexander* (2010) 49 Cal.4th 846, 922 (*Alexander*).)

---

[3] Rios cites *Hannon*, *supra*, 19 Cal.3d 588, for the proposition that direct evidence or conclusive proof that John perjured himself and that Rios knew about or authorized the fabricated testimony was necessary before CALCRIM No. 371 could be given. But in the more recent case of *Coffman & Marlow*, *supra*, 34 Cal.4th at page 102, our Supreme Court cited *Hannon* for the proposition that only sufficient evidence supporting those inferences is needed. *Coffman & Marlow* and subsequent case law have made clear that conclusive proof is not required. (*Coffman & Marlow*, at p. 102; *Watkins*, *supra*, 55 Cal.4th at pp. 1027-1028; *Alexander*, *supra*, 49 Cal.4th at pp. 921-922.) Rios fails to address those authorities.

9

There was sufficient evidence to support reasonable inferences both that John testified falsely that Doe 1 inappropriately touched him and that such false testimony was authorized by Rios. John told the forensic interviewer that he would attempt to "perfectly" describe the details of the alleged incidents and that he had been "memorizing" during the period that the interviewer took a break from the interview.[4] Both of those comments support a reasonable inference that John was not telling the truth about those allegations and was instead recounting a scripted account that he had been required to memorize. That inference is further supported by John's statement to the interviewer that his motivation for telling his mother about the allegations was that he wanted to help his dad. In addition, in response to a question about whether he was being truthful, John said that he was saying what happened because he was worried about his father and did not think what was happening to Rios was fair. A jury could reasonably infer from all of that evidence that John's testimony about being inappropriately touched by Doe 1 was fabricated in order to assist his father. That inference is further supported by the fact that the allegations were initially reported to Rios's defense attorney and not to law enforcement.

---

[4] Rios does not cite or mention (in his opening brief, reply brief, or two supplemental opening briefs) the forensic interview of John. Rios instead maintains that CALCRIM No. 371 was given "apparently based on the court's disbelief of [John], and his familial relationship to [Rios]." And without citing any evidence he erroneously claims that "there was no evidence [John] was committing perjury, and no evidence [Rios] had done anything in connection with [John's] testimony."

10

The jury could also reasonably infer that Rios knew about the fabrication and authorized it, given John's postarrest visits and telephone conversations with Rios and Rios's frequent visits with John's mother, Veronica L., and Rios's mother. There was also evidence that Veronica L. and Rios's mother may have been involved in initially reporting the allegations to Rios's attorney. In addition, Rios acknowledged that the phone he used to communicate with visitors during in-person visits at jail did not include a warning that the conversations were being recorded. Regular contact with Rios (by John, Rios's mother, and Veronica L.) before John's testimony is sufficient to support a reasonable inference that Rios, or others acting on his behalf and with his authorization, persuaded John to testify falsely.[5] (*Alexander*, *supra*, 49 Cal.4th at pp. 921-922.)

We therefore conclude that there was sufficient evidence to support giving the consciousness of guilt instruction.

B. *Alleged Prosecutorial Misconduct*

Rios claims that the prosecutor engaged in prejudicial misconduct during closing argument by (1) misstating the law of consent and duress, and (2) invoking the prestige of the prosecutor's office. We conclude that the prosecutor did not misstate the law and any other alleged misconduct was not prejudicial.

---

[5] We reject Rios's suggestion that the facts in this case are similar to those in *Hannon*, *supra*, 19 Cal.3d 588. In *Hannon*, there was neither direct nor circumstantial evidence that the defense attorney had communicated with the defense witness. (*Id.* at pp. 597-598.)

11

It is improper for the prosecutor to misstate the law during closing argument. (*People v. Bell* (1989) 49 Cal.3d 502, 538; *People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)  The prosecutor's remarks to the jury must be viewed "'[i]n the context of the whole argument and the instructions.'"  (*Centeno*, *supra*, at p. 667.)  It is also generally "misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it."  (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207.)

"Reversal of a judgment of conviction based on prosecutorial misconduct [under state law] is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to a defendant would have occurred absent the misconduct."  (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

1. *Consent*

Rios claims that during closing argument the prosecutor misstated the law on consent to the "forcible sex crimes under section[s] 288a [oral copulation] and 261 [rape]."  In discussing the elements of rape, the prosecutor stated:  "When it comes to children, we're primarily talking about duress, and I'll explain why in just a little bit.  [¶] . . . It tells you to consent, a woman must act freely and voluntarily and know the nature of the act.  And a seven-year-old or eight-year-old couldn't know the nature of the act and freely and voluntarily consent.  Again, nonissue."  According to Rios this is a misstatement of the law because "[t]he very crux of a prosecution under these statutes is a

12

showing that the defendant overcame the will of the complainant." Under his theory, "the jury was required to find [Doe 1] did not consent." (Boldface and some capitalization omitted.) The offenses were committed between Doe 1's seventh and ninth birthdays. Consent is not a defense to a sex crime against a child victim, and lack of consent is not an element of the offense. (*People v. Soto* (2011) 51 Cal.4th 229, 248 ["The prosecution need not prove that a lewd act committed by use of force, violence, duress, menace, or fear was also against the victim's will"]; *People v. Cook* (2017) 8 Cal.App.5th 309, 314-315.) We therefore conclude that the prosecutor did not misstate the law of consent.

2. *Duress*

Under section 261, subdivision (a)(2), rape is defined as an act of sexual intercourse "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." Similarly, "[a]ny person who commits an act of oral copulation upon a person who is under 14 years of age, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (§ 287, subd. (c)(2)(B)) is guilty of aggravated sexual assault of a child (§ 269, subd. (a)(4)). The People argued at trial that Rios committed those offenses through duress.

"'[D]uress' means '"a direct or implied *threat* of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1)

13

perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.'"'" (*People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*) [section 288]; *People v. Leal* (2004) 33 Cal.4th 999, 1005-1006; § 261, subd. (b).) "'"'The total circumstances, including the age of the victim, and [her] relationship to [the] defendant are factors to be considered in appraising the existence of duress.'"'" (*Veale*, *supra*, at p. 46; § 261, subd. (b).) "'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.'" (*Veale*, at p. 46.)

Rios complains that the italicized language in the following quotation from the prosecutor's closing argument reflects a misstatement of the law of duress: "And when you consider the relationship between someone who is a family member, who is a lot older than them, who is an authoritative figure in the home who they live with, who can tell them, '*Go get me a cup of water. Go into your room.* Don't do this. Don't do that.' All of those things are evidence of duress. Those are the things that you consider when you talk about a child." (Italics added.) When viewed in context, we do not agree that the prosecutor's statements about an adult telling a child to go to their room or to get a cup of water were given as examples of a direct or implied threat creating duress. Rather, the prosecutor was explaining how the totality of the circumstances of the relationship between an adult and a child should be considered in determining whether there was duress. In particular, Doe 1 testified that she would have obeyed if Rios gave her either

14

of those commands, because her parents had instructed her to comply with orders given by her aunts and uncles.  The prosecutor correctly observed that, in determining whether the duress element had been proved, the jury could consider whether Rios possessed the type of authority in Doe 1's life that would cause her to obey when he commanded her to go to her room or to get a cup of water.  (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 ["'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress"].)

Rios also complains that the prosecutor misstated the law when she told the jury: "She was seven and eight.  She was his family.  She was an adult [*sic*] within the home. *The threats of she wouldn't be believed or would be blamed, and all of those things—and that he'll say she wanted it.*  Remember that?  And his authoritative demeanor all come into play when you're talking about a child who is that young."  (Italics added.) According to Rios, there is no precedent supporting the proposition that "a forcible sex offense [can] be demonstrated by a 'threat' to the complainant that the complainant would not be believed if she reported the acts."  That is not so.

As explained in *People v. Senior* (1992) 3 Cal.App.4th 765, "[a] simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition."  (*Id.* at p. 775.)  Rios's warning to Doe 1 that she would not be believed if she told anyone what he was doing to her could be reasonably understood to be a warning not to report the abuse.  According to Doe 1, that is in effect

15

how she construed the directive from Rios that she would not be believed. She felt as though she was powerless to refuse because she believed Rios's warning that no one would believe her or that they would blame her if she told anyone what was happening. As the prosecutor correctly told the jury, the jury could consider that warning, along with the other circumstances in the case, in determining whether Doe 1 was under duress.[6] (*Id.* at pp. 770-771, 775 [sufficient evidence of duress based in part on warning to 13 year old daughter that reporting abuse would result in divorce]; see also *People v. Mejia* (2007) 155 Cal.App.4th 86, 101 [with adult rape victim, "[t]he manner of [the] defendant's repeated sexual assaults on the victim, including his warning her not to report the incidents, bespeaks psychological coercion, not normal sexual relations"].)

In sum, we conclude that the prosecutor did not misstate the law of duress.

3. *Prestige of Prosecutor's Office*

Rios argues that the prosecutor committed misconduct during closing argument by improperly invoking the prestige of the prosecutor's office. The People counter that the prosecutor did not commit misconduct and that, assuming there was misconduct, Rios suffered no prejudice. We conclude that if there was error it was not prejudicial.[7]

---

[6] Relying on *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1321 (*Espinoza*), Rios maintains that this purportedly "infirm theory is not very different from the suggestion that duress could be shown from a complainant's fear of the act itself." Rios does not explain why a warning not to report the abuse would amount to the same kind of "circular reasoning" denounced in *Espinoza*. (*Ibid.*)

[7] In general, a defendant waives the claim of prosecutorial misconduct in a closing argument by not objecting in the trial court. (*Centeno, supra*, 60 Cal.4th at p. 674; *People v. Dennis* (1998) 17 Cal.4th 468, 521-522.) The People argue that Rios forfeited

16

Rios complains of the following remarks made by the prosecutor to the jury during her initial closing argument:

"[W]hen you hear all of the evidence, when you hear and evaluate the witness, and her credibility is tested time and time again, and you get to hear all of the evidence, it is no longer an allegation. Okay? It's not—justice is not about convicting an innocent man. *We're not in the business of putting innocent people away. There is no justice in that*. (Italics added.)"

In rebuttal, the prosecutor stated:

"I want to start with these ethical attacks on me. You know, without saying the words, 'There is nothing unethical about that.' I was accused of being the most unethical prosecutor. The prosecutor was hiding things from you. The prosecutor wanted you to hear this, when the other thing happened.

"*Folks, I'm not in the business of putting—making people guilty of crimes they did not commit. That is not my intention. That is not the business I'm in. That is not the oath I took when I took office. That is not what we do here*." (Italics added.)

_____

the argument about the prosecutor's purported misconduct by failing to object to the prosecutor's remarks during closing argument. Rios asserts that the failure to object amounted to ineffective assistance of counsel. Because of this related ineffective assistance claim, we consider the merits of the misconduct claim. (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

17

Assuming that those comments invoked the prestige of the prosecutor's office and constituted misconduct, we conclude that they were harmless.**8** The remarks were isolated and made in the context of a much longer closing argument (44 pages of reporter's transcript), and there was strong evidence of Rios's guilt. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 (*Seumanu*) ["Despite this misstep, however, we find the prosecutor's misconduct in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt"]; *People v. Hart* (1999) 20 Cal.4th 546, 619-620 (*Hart*).) In addition to Doe 1's detailed testimony, Doe 2 testified about Rios sexually assaulting her too. Doe 1 was prompted to speak to Doe 2 by another relative who noticed that Doe 1 acted differently and more reserved around Rios. Furthermore, when Doe 1 and Doe 2 were waiting in the interview room in the police station and were being recorded by a hidden camera without being told about the recording, the women discussed what might have caused Rios to act the way that he had with them, the possible benefits of therapy to address their trauma, and their hatred of Rios. Doe 1 said that she did not have any additional tears to shed. All of that evidence provides powerful support for the credibility

---

**8**     Rios generally cites both federal and state law standards for determining whether prosecutorial misconduct results in prejudicial error. Given the isolated nature of the remarks, we conclude that the purported misconduct did not rise to the level of rendering Rios's trial fundamentally unfair so as to make his conviction a denial of due process under the federal Constitution. (*People v. Morales* (2001) 25 Cal.4th 34, 44 ["A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process"].) We therefore do not apply the more rigorous federal harmless error standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

18

of Doe 1's claims about what Rios did to her.  In addition, the evidence strongly supported an inference that Rios's son's testimony was fabricated at Rios's direction, which tended to show Rios's consciousness of guilt.  Viewed as a whole, the evidence introduced at trial overwhelmingly supported the guilty verdicts.

In addition, the trial court included the following handwritten admonition to the jury along with the other instructions:  "Ladies and gentlemen both the attorney for the [P]eople and the attorney for the defendant mentioned their counterparts during closing arguments.  Those comments are simply not relevant to your analysis[.]  [I]t would be inappropriate to make any factual determination based on whether you like or dislike the prosecutor or defense attorney.  Rather, your decisions must be based on YOUR independent analysis of the nature and quality of the evidence and witnesses who testified."

Although that admonition did not directly address the prosecutor's remarks about the prestige of her office, it did serve to reinforce other instructions given about the jurors' obligation to decide the case based on the evidence adduced at trial and not based on any "bias, sympathy, [or] prejudice," including any bias for or against the attorneys.  (CALCRIM No. 200.)  The jury was further instructed that nothing the attorneys said, including during closing argument, constituted evidence.  (CALCRIM No. 222.)  We assume that the jurors followed those instructions.  (*Seumanu*, *supra*, 61 Cal.4th at p. 1345.)

19

In sum, Rios has failed to demonstrate that it was reasonably probable that he would have received a more favorable result absent the prosecutor's allegedly improper statements. (*Seumanu*, *supra*, 61 Cal.4th at p. 1345.)

D. *Mandatory Consecutive Sentences Under Section 667.6(d)*

Rios contends that remand for resentencing is required because the trial court failed to make express factual findings to support imposing consecutive sentences under section 667.6(d). He further contends that "[t]he evidence at trial failed to establish all five offenses occurred on separate occasions." Both of those contentions lack merit.[9]

The trial court is required to impose consecutive sentences for multiple violations when "the crimes involve separate victims or involve the same victim on separate occasions" for certain enumerated offenses. (§ 667.6(d); § 667.6, subd. (e)(1) [including aggravated assault of a child, § 261, subd. (a)(2)]; § 667.6, subd. (e)(7) [oral copulation in

---

[9] In his reply brief, Rios claims for the first time that the jury, not the trial court, was required to make the separate occasions findings. Rios cites no authority to support that contention. (*People v. Stanley* (1995) 10 Cal.4th 764, 829 [no obligation to address an issue not supported by citations to legal authority].) "[W]e do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier." (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.) No good cause exists here given that in addition to his opening brief Rios was permitted to file two additional supplemental opening briefs. In any event, the contention lacks merit because "the United States and California Supreme Courts have held that the decision whether to run individual sentences consecutively or concurrently does not implicate the Sixth Amendment right to jury trial." (*People v. King* (2010) 183 Cal.App.4th 1281, 1324, citing *Oregon v. Ice* (2009) 555 U.S. 160, 162-165 & *People v. Black* (2007) 41 Cal.4th 799, 820-823; *People v. Scott* (2015) 61 Cal.4th 363, 405 [no violation of Sixth Amendment right to jury trial with imposition of consecutive sentences]; *People v. Wilson* (2008) 44 Cal.4th 758, 809, 813 [trial court did not violate the defendant's Sixth Amendment rights by imposing full consecutive terms under § 667.6(d)].)

20

violation of § 287, subd. (c)(2), as referenced in § 269, subd. (a)(4)].) In determining "whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6(d).)

At sentencing, the trial court explained its imposition of consecutive sentences as follows: "During that chambers conference, I indicated that I believed that I really don't have any discretion with respect to sentencing. [¶] . . . [T]he sentence in this matter is 75 years to life when you add all five charges together, because each of them carries a sentence of 15 to life." The trial court asked the defense attorney if he "disagree[d] . . . with that analysis," and the attorney responded, "Submit it."

The trial court is not required to provide a statement of reasons when imposing consecutive sentences under section 667.6(d).[10] (*People v. Craft* (1986) 41 Cal.3d 554,

---

[10] Relying on *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1072 (*Irvin*), Rios claims that the trial court is required to provide explicit findings on the record when sentencing a defendant to consecutive sentences under section 667.6(d). *Irvin* does not stand for that proposition. In *Irvin*, the defendant was sentenced to 20 consecutive life sentences under section 667.6(d) for sexual acts committed during a single assault, and the Court of Appeal expressed doubt that "any reasonable trier of fact could find that every act or offense was committed on a separate occasion." (*Irvin*, *supra*, at p. 1071.) Given the highly unusual circumstances of that case, the appellate court instructed the trial court on remand to made express factual findings if it again wished to impose consecutive

559 (*Craft*), superseded by statute on another ground as stated in *People v. Pena* (1992) 7 Cal.App.4th 1294, 1314.)  When a trial court imposes consecutive sentences under section 667.6(d), we may reverse only if the record does not contain substantial evidence that the offenses were committed on separate occasions, that is, "only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).)

There is ample evidence that the five offenses against Doe 1 occurred on five separate occasions.  For the two convictions of oral copulation of a child (§ 269, subd. (a)(4)), Doe 1 testified that Rios forced her to orally copulate him on two separate occasions at two different locations—once in the car and once in the garage.  That constitutes substantial evidence that those offenses were committed on separate occasions. (*People v. Jones* (1990) 51 Cal.3d 294, 316.)  It is consequently irrelevant that Rios also may have forced her to orally copulate him on a different occasion.  Nor is it relevant that Rios "vigorously defended [Doe 1's] account of an act of oral copulation in [Rios's] car," because we review the evidence in the light most favorable to the People. (See *People v. Green* (1996) 50 Cal.App.4th 1076, 1084-1085 [review of implied findings under § 654].)  The trial court was required to impose full consecutive sentences

---

sentences under section 667.6(d). (*Irvin*, at p. 1072.)  The court did not purport to state a general rule requiring express findings in every case involving consecutive sentences under section 667.6(d).

under section 667.6(d) for the two oral copulation offenses that occurred on separate occasions and were supported by substantial evidence.

With respect to the three rape offenses, there also was substantial evidence that Rios raped Doe 1 on three separate occasions—that is, on different days and not during the same encounter. She recounted in detail two of those occasions—the initial incident in the shed and another occasion in her mother's restroom. For those two offenses, there is no question that there is sufficient evidence to support mandatory consecutive sentences under section 667.6(d). Rios does not contend otherwise.

As to the third rape offense, however, Rios claims that it is not clear from Doe 1's testimony whether Rios raped her on an entirely separate occasion in the shed or raped her twice during the first encounter. It is irrelevant whether the evidence supported two reasonable inferences so long as substantial evidence supports the trial court's implied finding that the third rape offense occurred on a separate occasion. And it does.

Doe 1 testified repeatedly that there were multiple incidents in the shed. First, after Doe 1 recounted the details of the initial instance of sexual abuse in the shed, the prosecutor inquired: "Right now, I want to focus on other things that happened to you. Anything else that he's done to you in the shed?" Doe 1 responded: "Not that I recall. There was multiple occasions." Seeking clarification, the prosecutor asked: "How many times has this act of him putting his penis inside your vagina happen [*sic*] in the shed?" Doe 1 answered: "I believe once—well, first once. Twice. Twice." "So two times," the prosecutor asked, and Doe 1 answered "[y]es." One logical and reasonable inference that

can be adduced from this testimony is that Rios inserted his penis into Doe 1 during two different incidents or during two distinct encounters in the shed. This inference is supported by Doe 1's testimony that Rios sexually abused her 10 times over the course of one and one-half to two years with incidents occurring once every one to two months during that period. She recounted the details of four separate incidents and acknowledged that she could not recall the details of all. However, in the same line of questioning in which the prosecutor asked how many total times Rios sexually abused her, the prosecutor again asked, "How many times did things happen in the shed?" After initially responding that she could not recall, Doe 1 responded, "More than one." She then pinpointed the number of times as three. Doe 1's testimony that there were multiple occasions of sexual abuse that happened in the shed constitutes substantial evidence to support the trial court's implied finding that the third rape offense occurred on a separate occasion under section 667.6(d).

Rios contends that the trial court could have reasonably inferred from Doe 1's testimony as a whole that Doe 1 was raped twice on the first occasion in the shed. The contention is both incorrect—Doe 1 described in detail the initial incident of abuse in the shed, and she never said that Rios stopped raping her and later resumed doing so—and irrelevant. Because a reasonable trier of fact could have found, on this record, that the offenses were committed on separate occasions, we must affirm the imposition of consecutive sentences. (*Garza*, *supra*, 107 Cal.App.4th at p. 1092.) The existence of alternative reasonable inferences is of no consequence.

The record contains substantial evidence supporting the trial court's implied findings that five offenses against Doe 1 occurred during different encounters and thus on separate occasions. We therefore must affirm the imposition of five full consecutive sentences under section 667.6(d).

E. *Hearing on Ability to Pay Fines, Fees, and Restitution*

At sentencing, the court ordered Rios to pay $350 in court operations and facilities fees (§ 1465.8, subd. (a)(1); Gov. Code, § 70373), a $514.58 booking fee (Gov. Code, § 29550.2), a $10,000 restitution fine (§ 1202.4, subd. (b)), a $10,000 suspended parole revocation fine (§ 1202.45, subds. (b)-(c)), a $70 fine for rape offenses (§ 264, subd. (b)), and a $2,300 sex offender registration fine (§ 290.3, subd. (a)). The court declined to impose the costs of the presentence probation report (§ 1203.1b, subd. (a)) and presentence incarceration (§1203.1c, subd. (a)) because it determined that Rios did not have the ability to pay those costs.[11] That determination was based on Rios's attorney's representation that Rios "has no income, [and] is not likely to have income." According to the probation report, Rios worked until he was arrested.

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided while this appeal was pending, Rios argues that imposition of the fines and fees

---

[11] Given that Rios was sentenced to state prison, the imposition of presentence incarceration costs would not have been appropriate in any event. (§ 1203.1c, subd. (a) [presentence incarceration costs to be imposed "[i]n any case in which a defendant is convicted of an offense and is ordered to serve a period of confinement in a county jail, city jail, or other local detention facility as a term of probation or a conditional sentence"].)

without a determination of his ability to pay violated his due process rights.[12]  He also argues that imposition of those fines and fees without an ability to pay hearing violated the Eighth Amendment's prohibition against excessive fines.  We conclude that Rios forfeited any argument about the booking fee, the restitution fine, the rape offense fine, and the sex offender registration fine, and we further conclude that any error with respect to the court operations and facilities fees was harmless.[13]

Dueñas held that defendants have a due process right under the federal and state Constitutions to a hearing on their ability to pay court operations and facilities fees. (Dueñas, supra, 30 Cal.App.5th at p. 1164.)  In addition, "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to pay it.  (Id. at p. 1172.)  The same court that decided Dueñas has since clarified that, at the ability to pay hearing, the defendant bears the burden of showing his or her inability to pay, and the court "must consider all relevant factors," including "potential prison pay

---

[12]     The Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844 [2019 Cal. Lexis 8371], to decide whether a court is required to "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments."

[13]     The People argue that the restitution fine, the sex offender registration fine, and the rape offense fine totaling $2,370 are all punitive in nature and should be analyzed under the Eighth Amendment's excessive fines clause, not the due process clause.  They contend that those fines and the restitution fine are constitutional under the excessive fines clause.  Moreover, they argue that even if a due process analysis applies, the fines survive rational basis review and therefore are constitutional.  We need not address those arguments, given our conclusion that Rios forfeited his arguments about those fines.

26

during the period of incarceration to be served by the defendant." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491.) This court has held that a defendant sentenced before *Dueñas* cannot have forfeited a due process challenge to a minimum restitution fine or to court operations and facilities fee. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035 (*Jones*).)

The holding does not apply, however, to the maximum restitution fine under section 1202.4, subdivision (b), which is what was imposed here. This court has already held that a defendant forfeits this argument by failing to object to such a fine in the trial court or to request an ability to pay hearing. (*People v. Taylor* (2019) 43 Cal.App.5th 390, 399-400 (*Taylor*).) The substantive law in existence at the time of Rios's sentencing would have allowed the court to consider Rios's ability to pay the restitution fine. (*Ibid.*) The same holds true for the booking fee, the rape offense fine, and the sex offender registration fine based on the express language of the relevant statutes. (Gov. Code, § 29550.2, subd. (a) ["If the person has the ability to pay, . . ."]; §§ 264, subd. (b) ["The court shall, however, take into consideration the defendant's ability to pay . . ."], 290.3, subd. (a) ["unless the court determines that the defendant does not have the ability to pay the fine"].) Consequently, Rios forfeited the objection that the court failed to consider his ability to pay the restitution fine, the booking fee, the rape offense fine, and the sex offender registration fine.

The same is true for the parole revocation fine even though the statute itself does not expressly state that the court may or should consider a defendant's ability to pay in

setting the fine amount.  (§ 1202.45, subd. (b).)  That statute instead provides that the amount of the parole revocation fine must be the same as the restitution fine.  (*Ibid.*)  In relevant part, section 1202.45 provides that "[i]n every case where a person is convicted of a crime and is subject to . . . mandatory [postrelease] supervision . . . , the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional . . . mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (§ 1202.45, subd. (b).)  Because the amount of the parole revocation fine must be set at the same amount as the restitution fine, Rios should have objected when the trial court imposed the restitution fine.  Once the restitution fine was set, the trial court had no discretion to set the parole revocation fine at a different amount.  If we were to conclude that the challenge to the parole revocation fine was not forfeited along with the failure to challenge the restitution fine in the trial court, then we would be left without a viable remedy.  The trial court *cannot* reconsider the amount of the parole revocation fine *unless* it reconsiders the amount of the restitution fine.  But that argument was forfeited.  We therefore conclude that Rios forfeited the challenge to the parole revocation fine by failing to object to the restitution fine.

With respect to the court operations and facilities fees, we conclude that any error in imposing those fees without an ability to pay hearing was harmless beyond a reasonable doubt.  (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.)  "[E]very able-bodied" prisoner must work while imprisoned.  (§ 2700.)  Wages in prison range from $12 to $56

28

per month, depending on the job and skill level involved.  (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1); see also Cal. Code Regs., tit. 15, § 3040, subd. (k) ["An inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct"]; *People v. Cervantes* (2020) 46 Cal.App.5th 213, 229 [recognizing that an inmate's assignment to a paid position is a privilege].)

According to the probation report, Rios was 35 years old when he was sentenced, and he was in good mental and physical health without any physical limitations.  He will owe $350 in fees (as to which his challenges are not forfeited).  Assuming that Rios earns the minimum monthly wage in prison ($12) and does not have any money added to his trust accounts, he will pay off that total amount in approximately 30 months or two and one-half years.  Rios's sentence far exceeds two and one-half years.  We therefore conclude that the failure to conduct an ability to pay hearing for those fees and fines was harmless beyond a reasonable doubt.

DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____
                                                                              J.


We concur:

RAMIREZ _____
                    P. J.
McKINSTER _____
                    J.

29